UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
RESIDENTS AND FAMILIES UNITED TO SAVE
OUR ADULT HOMES et al.,

      Plaintiffs,      **MEMORANDUM & ORDER**

                  16-CV-1683 (NGG) (RER)

HOWARD ZUCKER, M.D., et al.,

      Defendants.
-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

  Plaintiffs bring this action against Defendants the New York State Department of Health ("DOH"), Howard Zucker, M.D., in his official capacity as Commissioner of DOH, the New York State Office of Mental Health ("OMH"), and Anne Marie T. Sullivan, M.D., in her official capacity as Acting Commissioner of OMH, challenging certain regulations (the "Regulations") promulgated by DOH and OMH, which limit admissions to adult homes.[1]

  Before the court is the Residents Plaintiffs'[2] motion for the judicial disqualification of the undersigned, the Honorable Nicholas G. Garaufis (the "Motion"). (Residents Pls. Not. of Mot. for Disqualification ("Mot.") (Dkt. 50); Residents Pls. Mem. in Supp. of Mot. ("Mem.") (Dkt. 51).) The Empire Plaintiffs[3] (together with the Residents Plaintiffs, "Plaintiffs") join in

---

[1] Originally, two separate actions were filed in state court. Those actions were later consolidated but the pleadings in each action remain separate. (See Consol. Order (Dkt. 19-10).) The entire consolidated action was subsequently removed to this court. (Not. of Removal (Dkt. 1).)

[2] The "Residents Plaintiffs" refer to the following parties: Residents and Families United to Save Our Adult Homes; New York State Health Facilities Association/New York State Center for Assisted Living; Kenneth Przyjemski; Walter Roberts; Hudson View Management Corp., d/b/a Palisade Garden HFA; Belle Harbor Manor; Elm York LLC; Kings Adult Care Center, LLC; Lakeside Manor Home for Adults, Inc.; Garden of Eden Home LLC, d/b/a Garden of Eden Home; Mohegan Park Home for Adults; Gloria's Manor LLC, d/b/a New Gloria's Manor Home for Adults; New Haven Manor; New Monsey Park Home; New Rochelle Home for Adults, LLC; Parkview HFA, Inc., as assignee of Parkview Home for Adults; Elener Associates, LLC, d/b/a Riverdale Manor Home for Adults; Seaview Manor, LLC; Surfside Manor Home for Adults, LLC; The Eliot Management Group, LLC, d/b/a The Eliot at Erie Station ALP; The Sanford Home; Wavecrest HFA, Inc., d/b/a Wavecrest Home for Adults; and Woodland Village LLC, d/b/a Fawn Ridge Assisted Living.

[3] The "Empire Plaintiffs" refer to the following parties: Empire State Association of Assisted Living, Inc.; Dutchess Care; Harbor Terrace Adult Home and Assisted Living; Central Assisted Living, LLC; Adirondack Manor Home for Adults; William Stanton; John Tory; Lucia Bennett; Joseph Simon; Lawrence Wong; and Susan Osterhoudt-Burnett.

1

this Motion. (See Luntz Affirmation (Dkt. 53) ¶ 5.) Defendants oppose the Motion. (Defs. Mem. in Opp'n to Mot. ("Defs. Opp'n") (Dkt. 54).) For the following reasons, the Motion is DENIED.

## I. LEGAL STANDARD

Plaintiff seek disqualification of the undersigned pursuant to 28 U.S.C. § 455(a), the Due Process Clause of the Fifth Amendment to the U.S. Constitution, and the Code of Conduct for United States Judges. (See generally Mem.) The court outlines the legal standard for each of the proffered bases for disqualification below.

### A. 28 U.S.C. § 455(a)

Pursuant to 28 U.S.C. § 455(a), a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The Supreme Court has explained that "[t]he goal of section 455(a) is to avoid even the appearance of partiality." Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 865 (1988) (internal citation omitted). Whether a judge's impartiality might reasonably be questioned is determined by whether "an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal, or alternatively, whether a reasonable person, knowing all the facts, would reasonably question the judge's impartiality." United States v. Yousef, 327 F.3d 56, 169 (2d Cir. 2003) (internal quotations omitted); see also United States v. Amico, 486 F.3d 764, 775 (2d Cir. 2007) (noting that the "test deals exclusively with appearances" and that "[i]ts purpose is the protection of the public's confidence in the impartiality of the judiciary").

"Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." Liteky v. United States, 510 U.S. 540, 555 (1994).[4] Accordingly, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Id. (noting that judicial rulings "can only in the rarest of circumstances evidence the degree of favoritism or antagonism required" to justify recusal); see id. at 551 (stating that some courts refer to this limited exception as the "pervasive bias" exception to the judicial source doctrine); see also United States v. Carlton, 534 F.3d 97, 100 (2d Cir. 2008) ("[O]pinions held by judges as a result of what they learned in earlier proceedings in a particular case are not ordinarily a basis for recusal." (internal quotation marks and citation omitted)).

Relatedly, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Liteky, 510 U.S. at 555. However, "[t]hey _may_ do so if they reveal an opinion that derives from an extrajudicial source; and they _will_ do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible."[5] Id.

"[W]here the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited." In re Aguinda, 241 F.3d 194, 201 (2d Cir. 2001). "[A]

---

[4] See also Chen v. Chen Qualified Settlement Fund, 552 F.3d 218, 227 (2d Cir. 2009) ("Generally, claims of judicial bias must be based on extrajudicial matters, and adverse rulings, without more, will rarely suffice to provide a reasonable basis for questioning a judge's impartiality."); United States v. Conte, 99 F.3d 60, 65 (2d Cir. 1996) ("Events occurring in the course of judicial proceedings generally do not constitute a basis for recusal absent indications that the judge's decision-making was so prejudiced that it called into question the fairness of the proceedings.").

[5] The Liteky Court noted that "[a]n example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the district court in Berger v. United States, 255 U.S. 22 (1921), a World War I espionage case against German-American defendants: 'One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans' because their 'hearts are reeking with disloyalty.'" 510 U.S. at 555 (quoting Berger, 255 U.S. at 28).

3

judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." Id. (internal citation omitted).

**B. Due Process Clause**

Under the Due Process Clause, "a judge must recuse himself when he has a direct, personal, substantial, pecuniary interest in a case." Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868, 876 (2009) (interpreting the Due Process Clause of the Fourteenth Amendment and noting that "[a] fair trial in a fair tribunal is a basic requirement of due process" but "most matters relating to judicial disqualification [do] not rise to a constitutional level" (alterations in original) (internal citation omitted)). The relevant inquiry is "not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" Id. at 881.

The recusal statutes, including 28 U.S.C. § 455, "were designed to protect Fifth Amendment guarantees, and therefore 'it would be anomalous to hold that a claim under the statutes insufficient on its merits could nevertheless satisfy the constitutional standard.'" United States v. Int'l Bus. Machs. Corp., 857 F. Supp. 1089, 1097 (S.D.N.Y. 1994) (citing In re Int'l Bus. Machs. Corp., 618 F.2d 923, 932 n.11 (2d Cir. 1980)). Accordingly, where a movant's claim of bias under Section 455 fails on the merits and does not mandate recusal, recusal is likewise unwarranted under the Due Process Clause. In re Int'l Bus. Machs. Corp., 618 F.2d at 932 n.11.

**C. Code of Conduct for United States Judges**

Canon 3C of the Code of Conduct for United States Judges (the "Code of Conduct") provides that "a judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which . . . the judge has a personal bias or prejudice concerning a party." Code of Conduct for United

4

States Judges, Canon 3(C)(1)(a) (2014), http://www.uscourts.gov/judges-judgeships/code-conduct-united-states-judges#c.

The requirements of Section 455(a) and Canon 3C of the Code of Conduct mirror one another. See Liljeberg, 486 U.S. at 858 n.7 (noting that Section 455 was amended in 1974 "to conform with . . . Canon 3C"); In re Literary Works in Elec. Databases Copyright Litig., 509 F.3d 136, 140 (2d Cir. 2007) (holding that Canon 3C is a "more-or-less identical analogue" to Section 455). Accordingly, a claim that fails under Section 455(a) also fails under Canon 3C of the Code of Conduct.

## II. BACKGROUND[6]

The undersigned has presided over litigation pertaining to adult homes for over fourteen years. Disability Advocates, Inc. v. Paterson et al., No. 03-CV-3209 (NGG) (MDG) ("DAI I"), which was filed in this court in 2003, involved years of litigation, including extensive discovery and multiple expert reports. That action concluded with a five-week bench trial during which 29 witnesses testified, more than 300 exhibits were admitted into evidence, and excerpts from the deposition transcripts of 23 additional witnesses were entered into the record. The court issued a 210-page Memorandum and Order finding that the plaintiff, Disability Advocates, Inc., had established a violation of the "integration mandate" of Title II of the American with Disabilities Act and Section 504 of the Rehabilitation Act. DAI I, 653 F. Supp. 2d 184, 187-88 (E.D.N.Y. 2009).

The Second Circuit reversed the judgment in DAI I on the grounds that Disability Advocates, Inc., lacked associational standing; however, the appellate court noted that, should the action be re-filed by the United States or by individual plaintiffs with standing, it would be

---

[6] For a more fulsome outline of the procedural history of the adult homes litigation, the court directs the parties to the court's January 23, 2017, Memorandum & Order, denying Plaintiffs' motion for remand and reassignment. (See Jan. 23, 2017, Mem. & Order (Dkt. 21).)

5

appropriate for the undersigned to handle the matter. See Disability Advocates, Inc. v. N.Y. Coalition for Quality Assisted Living, Inc., 675 F.3d 149, 162 (2d Cir. 2012) ("We are not unsympathetic to the concern that our disposition will delay the resolution of this controversy and impose substantial burdens and transaction costs on the parties, their counsel, and the courts. Should that situation arise, we are confident that the experienced and able district judge, as a consequence of his familiarity with prior proceedings, can devise ways to lessen those burdens and facilitate an appropriate, efficient resolution.").

In 2013, the United States and private plaintiffs re-filed the action against the State of New York; Andrew M. Cuomo, in his official capacity as Governor of the State of New York; DOH and the Commissioner of DOH; and OMH and the Commissioner of OMH. See United States v. New York, No. 13-CV-4165 (NGG) (ST)); O'Toole et al. v. Cuomo et al., No. 13-CV-4166 (NGG) (ST) (together with United States v. New York, "DAI II"). Then-Chief Judge Carol Bagley Amon assigned the case to the undersigned. (Order Reassigning Case (DAI II Dkt. 4)[7].) Shortly thereafter, the court certified the class of private plaintiffs (collectively, the "DAI Class" and individually, the "DAI Class Members"), and the parties entered into a settlement agreement (the "Settlement Agreement"). (See Nov. 20, 2013, Order (Class Dkt. 23)[8]; Proposed Stip. & Order of Settlement (DAI II Dkt. 5).) After two separate revisions of the proposed settlement and after conducting a fairness hearing on the proposed settlement, the court so-ordered the Settlement Agreement. (See Oct. 10, 2013, Order (Class Dkt. 12); Mar. 17, 2014, Order (Class Dkt. 59).) The court continues to oversee implementation of the Settlement Agreement, meeting

---

[7] "DAI II Dkt." refers to documents filed in Case No. 13-CV-4165 (NGG).
[8] "Class Dkt." refers to documents filed in Case No. 13-CV-4166 (NGG).

6

with the parties at least quarterly to discuss their progress towards the goals outlined in the agreement. (See 2d Am. Stip. & Order of Settlement ("2d Am. Settlement") (DAI II Dkt. 112).)

The adult homes did not participate in DAI I and they are not parties to DAI II or signatories to the Settlement Agreement.[9] Notwithstanding, in the course of adjudicating these cases, as well as the instant case, the court has become familiar with the practices of the adult homes and their counsel. The undersigned's opinions—or, more aptly put, perceived opinions— of the adult homes are based on facts developed in the course of DAI I, DAI II, and this case, rather than any extrajudicial source.

## III. DISCUSSION

The undersigned has reviewed Plaintiffs' allegations and determines that there is no basis for recusal. Plaintiffs' claim under 28 U.S.C. § 455(a) fails as "a reasonable person, knowing all the facts, would [not] reasonably question the judge's impartiality." Yousef, 327 F.3d at 169 (2d Cir. 2003). Because Plaintiffs cannot sustain their claim under Section 455(a), their arguments for disqualification under the Due Process Clause and Canon 3C of the Code of Conduct also fail. See supra Sections I.B.-C. Accordingly, Plaintiffs' Motion is denied.

### A. The Undersigned's Remarks About the Adult Homes

Plaintiffs complain about several specific comments that the undersigned made about the adult homes during judicial proceedings in DAI II and the instant case. While some of these

---

[9] Empire State Association of Assisted Living Inc. ("ESAAL"), a plaintiff in this action, and the New York Coalition for Quality Assisted Living ("NYCQAL") attempted to intervene at the remedy stage in DAI I in order, inter alia, to protect the economic interests of adult home operators. (See Order Denying Mot. to Intervene (DAI I Dkt. 400) at 2-3.) ESAAL and NYCQAL were represented by David T. Luntz and Jeffrey J. Sherrin respectively—Plaintiffs' counsel in this action—in their attempt to intervene. (See Mots. to Intervene (DAI I Dkts. 361).) The court denied the parties' intervention motions as untimely, finding that despite clear notice that the outcome of DAI I might impact their interests, ESAAL and NYCQAL "made the tactical decision to litigate 'on the cheap' by sitting on the sidelines, apparently planning to parade into court at the eleventh hour should the proceedings conclude unfavorably." (Order Denying Mot. to Intervene at 10.)

7

comments are critical of the practices of the adult homes, they do not reveal "such a high degree of . . . antagonism as to make fair judgment impossible." Liteky, 510 U.S. at 555.

Plaintiffs argue that the undersigned's statement that the adult home operators appealed from the DAI I judgment "in order to protect their financial interests" is evidence of "deeply rooted animosity towards adult homes." (Mem. at 5, 17; see Ex. E to Sherrin Decl. ("Aug. 19, 2015, Tr.") 54:6-10.) This argument strains credulity. The undersigned's comment stated the obvious: the adult homes are motivated, at least in part, by financial concerns, as the adult homes are for-profit institutions. (Cf. Joint Stips. of Fact (DAI I Dkt. 260-1)[10] ¶ 18 (DOH does not own the adult homes); Trial Tr. (DAI I Dkt. 416) 645:22-24 (adult homes are for-profit institutions).)

Plaintiffs further allege that the undersigned's "antipathy towards adult homes was . . . shown during a hearing on March 22, 2017, when, in reciting the history of the [DAI] litigation, [the undersigned] cited to newspaper articles published in the New York Times in 2002 that portrayed a few New York City adult homes, a number of which are now closed, in an extremely negative light." (Mem. at 5.) The undersigned did not express an opinion as to the truth of the matters reported on in the New York Times articles, however. (See Mar. 22, 2017, Status Conf. Tr. (DAI II Dkt. 91) 7:20-8:2.) The court cited the articles to explain that their publication was a precursor to the DAI I lawsuit. The articles are a matter of public record and have been widely circulated—due partly to the fact that the investigative journalist who wrote these stories, Clifford J. Levy, was awarded the Pulitzer Prize in 2003 for his reporting on this subject. No reasonable observer would think that the undersigned's "impartiality might reasonably be questioned" based on the fact that the undersigned cited—without additional commentary—

---

[10] "DAI I Dkt." refers to documents filed in Case No. 03-CV-3209 (NGG).

publicly-available articles, which are helpful to understanding the timeline and context of the adult homes cases.

Plaintiffs also contend that the undersigned has expressed "hostility" towards the mental health providers who contract with the adult homes. (Mem. at 5, 16.) According to Plaintiffs, the undersigned noted at a DAI II status conference that "he was 'cynical' of the relationship [between the adult home residents and the private mental health providers]" and "suggest[ed] that the providers are [ ] collu[ding] with adult home operators." (Id. at 5.) Plaintiffs selectively quote from the transcript of that status conference and omit necessary context for the undersigned's remarks. The subject remarks were made during a discussion of how to handle adult home residents who initially indicated that they wanted to transition into supported housing, were ready to transition, and then, at the last minute, changed their minds and no longer wished to move out of the adult home. (See Aug. 19, 2015, Tr. 52:12-54:56-20.) The undersigned asked the Senior Deputy Commissioner of OMH whether residents ever seek the help of mental health professionals "to try to work through the[se] issues," and the deputy responded that "[m]any of the adult homes have private contracts with psychiatrists." (Id. 53:16-54:5.) The undersigned expressed concern that those psychiatrists may not be able to provide objective advice to residents about whether they should transition into the community because the psychiatrists are employed by the adult homes. (Id. 54:17-55:10; 56:8-17.) Contrary to Plaintiffs' suggestion, this comment hardly conveys deep-seated antagonism towards the adult homes. The undersigned merely expressed concern about a possible conflict of interest.

In sum, Plaintiffs have not demonstrated that the undersigned's comments about the adult homes in judicial proceedings reflect "such a high degree of . . . antagonism as to make fair judgment impossible." Liteky, 510 U.S. at 555. Accordingly, recusal is not warranted on this basis.

## B. The Interaction Between the Regulations and the Settlement Agreement

Plaintiffs contend that the undersigned "cannot be expected to preside impartially" over this action because "he sees [this] action as an 'attack' upon the Federal Settlement he continues to supervise." (Mem. at 6.) Plaintiffs' argument misses the nuance of the interaction between the Regulations and the Settlement Agreement and does not provide a basis for disqualification.

The Regulations, among other things: (1) prohibit "transitional adult homes"[11] from admitting any person whose admission will increase the facility's mental health census—i.e., the percentage of its residents with "serious mental illness"[12]; and (2) prohibit psychiatric inpatient units of hospitals and freestanding psychiatric facilities licensed by OMH from discharging individuals with serious mental illness to transitional adult homes. See 14 N.Y.C.R.R. §§ 580.6, 582.6; 18 N.Y.C.R.R. §§ 487.4, 487.13. Four separate lawsuits have been brought by various plaintiffs—including operators of New York state-licensed adult homes as well as adult home residents—challenging the validity of the Regulations: this action; Doe v. Zucker, Index No. 007079/2016 (N.Y. Sup. Ct. Albany Cty.); Oceanview Home for Adults, Inc. v. Zucker, Index No. 006012/2016 (N.Y. Sup. Ct. Albany Cty.); and Hedgewood Home for Adults, LLC v. Zucker, Index No. 052782/2016 (N.Y. Sup. Ct. Dutchess Cty.) (collectively, the "Regulations Actions").[13]

At the time this action was removed to federal court, Plaintiffs' challenge to the Regulations was a "direct attack" on the Settlement Agreement in that the continuing validity of

---

[11] A "transitional adult home" is defined as an "adult home with a certified capacity of 80 beds or more in which 25 percent or more of the resident population are persons with serious mental illness." 11 N.Y.C.R.R. § 487.13(a)(1).

[12] "Individuals with serious mental illness" are "individuals who meet criteria established by the commissioner of mental health, which shall be persons who have a designated diagnosis of mental illness under the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR, American Psychiatric Association, July 2000), and whose severity and duration of mental illness results in substantial functional disability." 11 N.Y.C.R.R. § 487.2(c).

[13] The court notes, in passing, a few observations. While the Regulations Actions were brought in multiple courts in different counties, the same lawyer—Jeffrey J. Sherrin—represents the plaintiffs in each of the four Regulations Actions. These four lawsuits advance nearly identical allegations, and they involve similarly situated parties.

10

the Settlement Agreement was contingent on the Regulations being upheld. Section O.1 of the Settlement Agreement—since removed from the agreement—provided:

> In the event that . . . a court of competent jurisdiction issues a temporary restraining order, a preliminary or permanent injunction, or judgment staying the enforcement of, or invalidating, whether in whole or in material part, the [ ] Regulations . . . , the Parties shall meet and confer in good faith to determine appropriate modifications to this Agreement that would give effect to the original intent of the Parties as expressed herein. . . . If, after the [meet and confer] period, the Parties fail to reach an agreement on appropriate modifications to this Agreement, then this Agreement will become null and void . . . .

(Am. Stip. & Order of Settlement (DAI II Dkt. 23) § O.1.)

In November 2016, John Doe, an individual with serious mental illness and a former resident of the Oceanview Manor for Adults ("Oceanview") who had transitioned to supported housing, brought suit against Howard Zucker, M.D., in his official capacity as Commissioner of DOH, and Anne Marie T. Sullivan, M.D., in her official capacity as Commissioner of OMH, challenging the Regulations and seeking readmission into an adult home. See Doe v. Zucker, Index No. 007079/2016 (N.Y. Sup. Ct. Albany Cty.). Doe subsequently moved for a temporary restraining order ("TRO") enjoining enforcement of the Regulations. (See Mot. for TRO in Doe v. Zucker.) On February 16, 2017, Acting Supreme Court Justice Denise Hartman granted the requested relief and entered a TRO, enjoining enforcement of the Regulations pending a determination of Doe's motion for a preliminary injunction, which was set to be heard on July 28, 2017. (See Feb. 16, 2017, Order in Doe v. Zucker.) The State consented to entry of the 5-month TRO, neglecting to inform Justice Hartman that there was a settlement in federal court that was contingent on the Regulations not being enjoined by a court.[14] (See Feb. 22, 2017, Status Conf. Tr. (DAI II Dkt. 100) 12:3-13:8.)

---

[14] The TRO remains in effect despite the fact that DOH has granted Doe permission to return to an adult home. (See Aug. 3, 2017, Decision & Order in Doe v. Zucker (declining to vacate TRO); May 11, 2017, Ltr. from State (DAI II

11

The parties to the DAI II Settlement Agreement thus entered into the 120-day window reserved for negotiating modifications to the Settlement Agreement. Facing the threat that the entire Settlement Agreement could become null and void if an agreement to modify was not promptly reached, the parties agreed to strike Section O.1 from the Settlement Agreement. (See 2d Am. Settlement.)

Notwithstanding the removal of Section O from the Settlement Agreement, the court has stated its view that enforcement of the Regulations is critical to achieving the goals of the Settlement Agreement, as the agreement is currently written. The Regulations limit the admission of individuals with serious mental illness into adult homes whose mental health census is 25 percent or more. If the Regulations are eliminated, it will open the front doors of the adult homes to individuals with serious mental illness. The size of the DAI Class—defined as individuals with serious mental illness who reside in NYC Impacted Adult Homes[15] (see 2d Am. Settlement)—could grow exponentially. This would make it increasingly difficult for the State to fulfill its obligations under the Settlement Agreement, including its duty to (1) fund supported housing units in a quantity sufficient such that every DAI Class Member for whom

---

Dkt. 108) (stating that DOH has repeated its "offer to facilitate Mr. Doe's transfer into one of the Adult Homes he was considering" but "Mr. Doe has not made up his mind as to the home he wants to be admitted").)

On March 22, 2017, Commissioner Zucker indicated to the court that DOH had no objection to Doe returning to Oceanview. (See Mar. 22, 2017, Status Conf. Tr. (DAI II Dkt. 91) 35:1-15.) The undersigned therefore instructed the State to advise the state court that Doe v. Zucker is moot and added that "the TRO will therefore be rescinded." (Id. 35:16-24.) Plaintiffs argue that the undersigned's instruction "would have the effect of depriving Plaintiff Doe and his attorneys of the right to litigate their own case in the court of their choosing" and demonstrates that the undersigned cannot "preside impartially over the instant case." (Mem. at 13-14.) Plaintiffs' argument is unavailing. It was entirely appropriate for the court to use its inherent authority to manage its docket as well as its equitable powers to instruct the State—a party to the Settlement Agreement—to remedy the fact that it had undermined the Settlement Agreement over which the undersigned presides. Moreover, even if the court had not directed the State to raise the issue of mootness, the state court was obligated to consider the issue in determining whether it had subject matter jurisdiction over the action. See Matter of Grand Jury Subpoenas for Locals 17, 135, 257 and 608 of the United Bhd. of Carpenters and Joiners of Am., AFL-CIO, 528 N.E.2d 1195, 1197 (N.Y. 1988) ("[M]ootness is a doctrine related to subject matter jurisdiction and thus must be considered by the court sua sponte . . . .").

[15] "NYC Impacted Adult Homes" are defined in the Settlement Agreement as "[a]dult homes in New York City with certified capacities of 120 or more in which 25 percent or more of the residents or 25 residents, whichever is less, have serious mental illness." (2d Am. Settlement at 2.)

12

supported housing is appropriate is afforded an opportunity to transition to a unit; (2) conduct in-reach in each NYC Impacted Adult Home; (3) complete assessments to determine the housing and service needs and preferences of each DAI Class Member who wishes to transition to supported housing; and (4) transition, where appropriate, DAI Class Members from NYC Impacted Adult Homes to supported housing. (See generally 2d Am. Settlement.) In addition, the Settlement Agreement contains certain milestones that may be difficult to meet if the size of the DAI Class grows dramatically.[16]

Plaintiffs seem to suggest that, given the interplay between the Regulations and the Settlement Agreement, the undersigned will be reluctant to find the Regulations invalid. This interpretation is mistaken, however. The undersigned is committed to reaching the correct legal result in this action, regardless of its effect on DAI II. If the court finds that the Regulations are, as alleged, invalid, then the DAI II parties may need to modify the Settlement Agreement to, for example, limit the size of the DAI Class or readjust the milestones and timing for transitioning DAI Class Members into supported housing. The State, for its part, may need to develop better processes for more quickly transitioning DAI Class Members into supported housing. The court is confident that the parties can make these and other necessary changes to the Settlement Agreement. In fact, the parties are already in the process of renegotiating the Settlement Agreement to make it more workable. (See Stip. & Order (DAI II Dkt. 111) ¶ 10 (stating that the "parties agree to continue to negotiate in good faith . . . possible additional revisions to the [Settlement Agreement]").)

---

[16] By the end of the fourth year of the agreement, the State must have assessed at least 2,500 DAI Class Members and, if appropriate, have transitioned those who desire into supported housing. (2d Am. Settlement § I(1).) By the end of year five, the State must provide all DAI Class Members the opportunity to move into supported housing. (Id.)

13

Accordingly, based on the current record, the undersigned sees no inherent conflict in continuing to preside over <u>DAI II</u> and the instant action.

### C. Appointment of a Guardian ad Litem

Moreover, contrary to Plaintiffs' belief, the fact that the court appointed a guardian ad litem in this action does not draw into question the undersigned's impartiality. (See Mem. at 21.) After <u>Residents and Families</u> was removed to this court, the State expressed concern that several DAI Class Members were named plaintiffs in this lawsuit but may not be voluntary and knowing participants therein. (See Defs. Opp'n to Mot. to Remand (Dkt. 19-25) at 6 (noting that "it is far from clear that all—or even most—of these resident plaintiffs actually hold the views that the adult homes' paid representatives purport to ascribe to them").) In a deposition taken in December 2015, DAI Class Member Walter Roberts testified that: (i) he did not recognize an affidavit with his signature that was submitted in the litigation; (ii) he did not oppose the Regulations; and (iii) he did not believe that New York State had ever threatened to violate his rights. (See Ex. D to Defs. Opp'n to Mot. to Remand (Dkt. 19-30).) In view of this evidence, the court became concerned that: (1) the interests of the DAI Class Members who are plaintiffs in the Regulations Actions and the interests of the adult homes who are also plaintiffs in the Regulations Actions may not be coextensive; and (2) there may be a disconnect between at least one of the DAI Class Members who is a plaintiff in this action and the claims in the Regulations Actions. Accordingly, the court appointed a guardian ad litem to protect the rights of the Class Members Plaintiffs. (See Order Appointing Guardian (Dkt. 42) at 3.)

It was well-within the court's authority to appoint a guardian ad litem to protect the DAI Class Members.[17] See <u>James v. New York</u>, 415 F. App'x 295, 297 (2d Cir. 2011) (summary

---

[17] Plaintiffs aver that the undersigned appointed a guardian ad litem "for plaintiffs in state court actions over which Judge Garaufis has no jurisdiction." (Mem. at 21.) The court initially instructed the guardian ad litem to investigate the circumstances surrounding each DAI Class Member's participation in any of the four Regulations Actions. (See

14

order) ("Federal courts have inherent, discretionary power to appoint a guardian ad litem when it appears that an incompetent person's general representative has interests which may conflict with those of the person he is supposed to represent." (citing Ad Hoc Comm. of Concerned Teachers v. Greenburgh #11 Union Free Sch. Dist., 873 F.2d 25, 30 (2d Cir. 1989))); see also Fonner v. Fairfax Cty., Va., 415 F.3d 325, 330-31 (4th Cir. 2005) (affirming district court's appointment of a guardian ad litem to determine whether an intellectually disabled resident of a group home (who was represented by counsel) was a willing participant in the litigation). Accordingly, this appointment cannot serve as a basis for disqualification.

Moreover, the fact that the undersigned has raised concerns about possible unethical behavior on the part of Plaintiffs' counsel, Jeffrey Sherrin, does not change the outcome here. (See Mem. at 6 (arguing that the undersigned "accused Plaintiffs' counsel of unethical behavior for representing residents and adult homes in this action").)[18] "[J]udicial remarks . . . that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Liteky, 510 U.S. at 555. Moreover, "[j]udges are obligated to alert disciplinary authorities to possible unethical conduct by attorneys. Judges do not demonstrate possible bias or prejudice when they discharge that obligation." United States v. Mendoza, 468 F.3d 1256, 1262 (10th Cir. 2006) (internal citation omitted). The undersigned has faithfully worked to ensure that the attorneys who appear in this court act in a professionally responsible manner and that their clients' interests are properly safeguarded. While the

---

Order Appointing Guardian (Dkt. 42) at 3.) The court has, however, at least for the time being, limited the guardian ad litem's inquiry to the DAI Class Members involved in the Residents and Families action. (See Order (Dkt. 46) at 2.) Notwithstanding, the court maintains that it has the authority to appoint a guardian ad litem to investigate whether a DAI Class Member's participation in any state court action involving the Regulations is voluntary and knowing, as the court has jurisdiction over DAI II and an obligation to protect the rights of the DAI Class Members.

[18] Plaintiffs also complain that on February 19, 2016, the undersigned criticized Sherrin for filing a letter in DAI II that the court characterized as "filled with innuendo and rumor" and "pandering to [a] client." (Mem. at 5-6.)

15

undersigned has raised concerns about Sherrin's professionalism,[19] he has also commented on the behavior of other attorneys in the DAI II case. It is not as though Sherrin has been exclusively targeted. For example, when the undersigned discovered that DOH had consented to entry of a five-month TRO in Doe v. Zucker, which enjoined enforcement of the Regulations, and had not told the presiding justice in that action that there was a federal settlement that hinged on those Regulations, the undersigned stated that the State, including the Office of the Attorney General, may have acted in "bad faith" and taken actions in the state court that were "unprofessional, irresponsible[,] and uncalled for."[20] (See Feb. 22, 2017, Status Conf. Tr. 12:3-20:11.)

Accordingly, the fact that the court appointed a guardian ad litem and has been attuned to considerations of ethics and professionalism in the adult homes litigation with respect to all parties and counsel does not create the appearance of partiality mandating the undersigned's disqualification.

### D. The Undersigned's Spouse's Prior Work for Fountain House

Finally, the fact that the undersigned's spouse was previously a volunteer board member for Fountain House, Inc., and Fountain House of New Jersey, Inc. (collectively "Fountain House")—a non-for-profit organization "dedicated to the recovery of men and women with mental illness by providing opportunities for [individuals with mental illness] to live, work, and

---

[19] The fact that the court has expressed concerns about Sherrin's professionalism suggests that Plaintiffs' counsel may not have clean hands or, at the very least, a pure motive for moving to disqualify the undersigned.

[20] Based on a document production from the State in DAI II, the DAI Class alleged that Sherrin and Michael Bass and/or Richard Zahnleuter—from the General Counsel's office at DOH—negotiated a potential settlement agreement "pursuant to which the DOH and OMH regulations incorporated into Section O of the Settlement Agreement . . . would be adjudged null and void." (Mot. for Discovery (Class Dkt. 138) at 1-2.) During these negotiations, Sherrin allegedly "proposed a 'side agreement' providing that the Adult Homes would 'provide testimony, evidence, [and] argument to support [the] State in challenge[s] to federal settlement or subsequent lawsuit over [the] same issues." (Id. at 2 (alterations in original).) The DAI Class further allege that Sherrin told the State that he "had to file another action because 'my clients need to see that their money is well spent,'" and less than two weeks later Doe v. Zucker was filed. (Id.)

16

learn, while contributing their talents through a community of mutual support"[21]—does not create an appearance of bias necessitating recusal. Recusal is not required where, as here, "the alleged interest or bias on the part of the judge or his spouse is not direct, but is remote, contingent, or speculative." United States v. Arena, 180 F.3d 380, 398 (2d Cir. 1999) (internal quotation marks and citation omitted), abrogated in part on other grounds by United States v. Sekhar, 683 F.3d 436, 440 (2d Cir. 2012).

Of prime importance here is the fact that Fountain House is not a party to the case before this court, has not expressed a position on the issues raised in this litigation, and, to the best of the court's knowledge, does not stand to gain financially or otherwise as a result of any possible outcomes of the proceedings.[22] Plaintiffs do not raise any facts suggesting otherwise.

Additionally, the fact that the undersigned's spouse previously held this volunteer board position has been a matter of public record at least as early as March 22, 2007, when the court stated the following on the record at the first status conference in DAI I:

> My wife is on the Board of Directors of Fountain House, which is an organization which assists people with mental illness in a residential setting for many of them. And so, I'm familiar with that organization. I have no connection to it, but I just thought you all ought to know that.

(Mar. 22, 2007, Status Conf. Tr. (DAI I Dkt. 451) 10:6-13.)[23] She joined the board before the undersigned met her in 1999, and she resigned from her board position in 2013—well before this

---

[21] See Fountain House Mission, https://www.fountainhouse.org/about/mission (last accessed Sept. 13, 2017).

[22] While Fountain House operates a supported housing network in New York State, see Fountain House Housing, https://www.fountainhouse.org/what/model/housing (last accessed Sept. 13, 2017), the organization's work extends far beyond housing—the subject of the instant case. For example, Fountain House provides its members education and employment opportunities. See Fountain House Our Model, https://www.fountainhouse.org/what/model (last accessed Sept. 13, 2017).

[23] Disability Advocates, Inc. indicated that it did not have an issue with the fact that the undersigned's wife was on the board and the State did not voice disagreement with the undersigned presiding over the action. (See Mar. 22, 2007, Status Conf. Tr. 10:20-21, 11:2-6.)

17

action was removed to this court. (See May 18, 2017, Pre-Mot. Conf. Tr. (Dkt. 41) 9:22-10:5, 21:21-23.)

More importantly, the undersigned's spouse's community endeavors have no bearing on the undersigned's ability to adjudicate the issues in this matter in a fair manner. The undersigned's views are based on fourteen years of presiding over the adult homes litigation. Moreover, the fact that the undersigned attended Fountain House (Art) Gallery's 2008 Celebration of Life Benefit—an event co-chaired by the undersigned's spouse—does not undermine the undersigned's independence. The undersigned attended the event as a showing of spousal support rather than support of the organization, and in the court's view, attendance at an event co-sponsored by one's spouse gives rise to an inference of spousal support, not support for the event itself. Accordingly, the undersigned's attendance at the event in these circumstances does not create an appearance of bias necessitating recusal. Therefore, there is no basis on which to conclude that a reasonable person, knowing all of the facts, would question the undersigned's impartiality based on the undersigned's spouse's past volunteer activities. Yousef, 327 F.3d at 169.

Notably, Plaintiffs do not point to a single instance of the undersigned's alleged bias affecting the court's decision-making. In fact, the court recently ruled in favor of Plaintiffs, denying Defendant-Intervenor Maria Vila's request for a temporary restraining order enjoining the adult homes from retaliating against any resident of an adult home who has intervened, moved to intervene, or has expressed a desire to intervene in the Regulations Actions. (See Mem. & Order Denying TRO (Dkt. 67).)

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion (Dkt. 50) is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
November 22, 2017

/s Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge