UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
RESIDENTS AND FAMILIES UNITED TO SAVE
OUR ADULT HOMES et al.,

                Plaintiffs,

HOWARD ZUCKER, M.D., et al.,

                Defendants.
-----------------------------------------------------------------X

**MEMORANDUM & ORDER**

16-CV-1683 (NGG) (RER)

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs bring this action against Defendants the New York State Department of Health ("DOH"); Howard Zucker, M.D., in his official capacity as Commissioner of DOH; the New York State Office of Mental Health ("OMH"); and Anne Marie T. Sullivan, M.D., in her official capacity as Acting Commissioner of OMH, challenging certain regulations (the "Regulations") promulgated by DOH and OMH, which limit admissions to adult homes.[1]

Before the court is Defendants' motion for dismissal of the Residents Plaintiffs'[2] second amended complaint (2d Am. Compl. ("SAC") (Dkt. 1-2)), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (the "Motion"), and Defendants' supplemental motion for dismissal of the Empire Plaintiffs'[3] first amended petition (1st Am. Pet. ("FAP") (Dkt. 19-8)),

---

[1] Originally, two separate actions were filed in state court—one by the "Residents Plaintiffs," defined in note 2, infra, and the other by the "Empire Plaintiffs," defined in note 3, infra. Those actions were later consolidated, but the pleadings in each action remain separate. (See Consol. Order (Dkt. 19-10).) The entire consolidated action was subsequently removed to this court. (Not. of Removal (Dkt. 1).)

[2] The "Residents Plaintiffs" refer to the following parties: Residents and Families United to Save Our Adult Homes; New York State Health Facilities Association/New York State Center for Assisted Living; Kenneth Przyjemski; Walter Roberts; Hudson View Management Corp., d/b/a Palisade Garden HFA; Belle Harbor Manor; Elm York LLC; Kings Adult Care Center, LLC; Lakeside Manor Home for Adults, Inc.; Garden of Eden Home LLC, d/b/a Garden of Eden Home; Mohegan Park Home for Adults; Gloria's Manor LLC, d/b/a New Gloria's Manor Home for Adults; New Haven Manor; New Monsey Park Home; New Rochelle Home for Adults, LLC; Parkview HFA, Inc., as assignee of Parkview Home for Adults; Elener Associates, LLC, d/b/a Riverdale Manor Home for Adults; Seaview Manor, LLC; Surfside Manor Home for Adults, LLC; The Eliot Management Group, LLC, d/b/a The Eliot at Erie Station ALP; The Sanford Home; Wavecrest HFA, Inc., d/b/a Wavecrest Home for Adults; and Woodland Village LLC, d/b/a Fawn Ridge Assisted Living.

[3] The "Empire Plaintiffs" refer to the following parties: Empire State Association of Assisted Living, Inc.; Dutchess Care; Elm York, LLC; Harbor Terrace Adult Home and Assisted Living; Central Assisted Living, LLC; Adirondack

1

pursuant to Federal Rule of Civil Procedure 12(b)(1) (the "Supplemental Motion"). (Mot. to Dismiss ("Mot.") (Dkt. 57); Mem. in Supp. of Mot. ("Mem.") (Dkt. 58); Suppl. Br. (Dkt. 90).) Plaintiffs oppose the Motion and the Supplemental Motion. (Pls. Mem. in Opp'n to Mot. ("Pls. Opp'n") (Dkt. 59); Pls. Br. in Opp'n to Suppl. Br. ("Pls. Suppl. Opp'n").) For the following reasons, the court GRANTS both the Motion and the Supplemental Motion.[4]

## I. BACKGROUND[5]

### A. DAI Litigation

The undersigned has presided over litigation involving adult homes for over fourteen years. Disability Advocates, Inc. v. Paterson, No. 03-CV-3209 (NGG) (MDG) ("DAI I"), which was filed in this court in 2003, involved years of litigation, including extensive discovery and multiple expert reports. That action concluded with a five-week bench trial during which 29 witnesses testified, more than 300 exhibits were admitted into evidence, and excerpts from the deposition transcripts of 23 additional witnesses were entered into the record. The court issued a 210-page Memorandum and Order finding that the plaintiff, Disability Advocates, Inc., had established a violation of the "integration mandate" of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. DAI I, 653 F. Supp. 2d 184, 187-88 (E.D.N.Y. 2009).

The Second Circuit reversed the judgment in DAI I on the grounds that Disability Advocates, Inc., lacked associational standing; the appellate court noted, however, that, should

---

Manor Home for Adults; William Stanton; John Tory; Lucia Bennett; Joseph Simone; Lawrence Wong; Susan Osterhoudt-Burnett; Jeffrey Frost; and Mario Vogelmann.

[4] The court notes that also pending before the court is a motion by George Iwczenko, Ruth Rivera, and Eric Scoff to intervene in this action as defendants. (Mot. to Intervene (Dkt. 79).) Because the court grants Defendants' Motion and Supplemental Motion, the motion to intervene is moot, and the court need not address it.

[5] For a more fulsome outline of the procedural history of the adult homes litigation, the court directs the parties to the court's January 23, 2017, Memorandum & Order, denying Plaintiffs' motion for remand and reassignment. (See Jan. 23, 2017, Mem. & Order (Dkt. 21).)

2

the action be re-filed by the United States or individual plaintiffs with standing, it would be appropriate for the undersigned to handle the matter. See Disability Advocates, Inc. v. N.Y. Coalition for Quality Assisted Living, Inc., 675 F.3d 149, 162 (2d Cir. 2012) ("We are not unsympathetic to the concern that our disposition will delay the resolution of this controversy and impose substantial burdens and transaction costs on the parties, their counsel, and the courts. Should that situation arise, we are confident that the experienced and able district judge, as a consequence of his familiarity with prior proceedings, can devise ways to lessen those burdens and facilitate an appropriate, efficient resolution.").

In 2013, the action was re-filed by the United States and private plaintiffs against the State of New York; Andrew M. Cuomo, in his official capacity as Governor of the State of New York; DOH and the Commissioner of DOH; and OMH and the Commissioner of OMH. See United States v. New York, No. 13-CV-4165 (NGG) (ST); O'Toole et al. v. Cuomo et al., No. 13-CV-4166 (NGG) (ST) (together, "DAI II"). Then-Chief Judge Carol Bagley Amon assigned the case to the undersigned. (Order Reassigning Case (DAI II Dkt. 4)[6].) Shortly thereafter, the court certified the class of private plaintiffs (collectively, the "DAI Class," and, individually, the "DAI Class Members"), and the parties entered into a settlement agreement (the "Settlement Agreement"). (See Nov. 20, 2013, Order (Class Dkt. 23)[7]; Proposed Stip. & Order of Settlement (DAI II Dkt. 5).) After two separate revisions of the proposed settlement and after conducting a fairness hearing on the proposed settlement, the court so-ordered the Settlement Agreement. (See Oct. 10, 2013, Order (Class Dkt. 12); Mar. 17, 2014, Order (Class Dkt. 59).) The court continues to oversee implementation of the Settlement Agreement, meeting with the parties at

---

[6] "DAI II Dkt." refers to documents filed in Case No. 13-CV-4165 (NGG).
[7] "Class Dkt." refers to documents filed in Case No. 13-CV-4166 (NGG).

3

least quarterly to discuss their progress towards the goals outlined in the agreement. (See 2d Am. Stip. & Order of Settlement ("2d Am. Settlement") (DAI II Dkt. 112).)

B. **The Regulations**

In 2013, OMH and DOH enacted regulations pertaining to "transitional adult homes"[8] (the "Regulations"). The Regulations prevent OMH-licensed psychiatric hospitals from discharging persons with serious mental illness ("SMI") to transitional adult homes. N.Y. Comp. Codes R. & Regs. ("NYCRR"), tit. 14, § 580.6(c). The DOH Regulations, correspondingly, prohibit transitional adult homes from admitting additional residents with SMI. NYCRR, tit. 18, § 487.4(c). The DOH regulations also compel transitional adult homes to submit a compliance plan that aims to bring their SMI population under 25 percent. NYCRR, tit. 18, § 487.13(c). The Regulations state that this plan should be accomplished through "lawful discharge" of residents with SMI into the community. Id. Importantly, the Regulations do not countenance the involuntary displacement of residents who desire to continue to live in their current adult homes. Id.

The DOH Regulations also require transitional adult homes to provide space for meetings held between residents and housing contractors for discussions of other possible future housing options for the residents. NYCRR, tit. 18, § 487.13(h). In addition, the Regulations prohibit transitional adult homes from trying to "influence or otherwise discourage individual residents from meeting with such entities and individuals." Id.

After the Regulations were enacted, various plaintiffs, some of which were adult homes, brought actions in state court to block the implementation of the Regulations. One of these

---

[8] The State of New York defines "transitional adult homes" as adult homes that have a "certified capacity of 80 beds or more in which 25 percent or more of the resident population are persons with serious mental illness." NYCRR, tit. 18, § 487.13(b)(1).

4

actions, which was filed in Kings County Supreme Court, was entitled <u>Residents and Families United to Save Our Adult Homes v. Shah</u>, and a second state-court action was entitled <u>Empire State Association of Assisted Living, Inc. v. Shah</u>. These two actions were consolidated in state court (though their pleadings remained separate), and the entire consolidated action was then removed to this court. (Not. of Removal (Dkt. 1).)

### C. The Residents Plaintiffs' Second Amended Complaint

The Residents Plaintiffs filed their SAC on April 1, 2016, in state court, and Defendants then removed the consolidated action to this court. The SAC includes eleven claims. Of these, nine allege that Defendants have infringed the rights of individuals with mental illness. (See SAC ¶¶ 217-20 (Americans with Disabilities Act ("ADA")); id. ¶¶ 221-24 (Rehabilitation Act); id. ¶¶ 225-28 (Fair Housing Act ("FHA")); id. ¶¶ 229-31 (New York Human Rights Law); id. ¶¶ 232-40 (intimate association); id. ¶¶ 241-42 (due process); id. ¶¶ 248-51 (ultra vires); id. ¶¶ 252-57 (arbitrary and capricious); id. ¶¶ 258-61 (equal protection).) There are two general types of injury that the pleading alleges that these affected individuals have incurred: First, that mentally disabled individuals have been or will be denied the right to live where they choose to live; (see id. ¶¶ 5, 133, 219, 223, 227, 230, 233;) and second, that the Regulations have caused mentally disabled individuals to suffer coercion or harassment (id.; see also id. ¶¶ 241-42.).

The Residents Plaintiffs also assert two claims on behalf of adult homes and their operators. First, the Residents Plaintiffs allege that the Regulations limit adult home operating certificates and force adult homes to reduce their resident population in violation of the due process rights of the homes and operators under the U.S. and New York constitutions. (Id. ¶¶ 243-47.) Second, the Residents Plaintiffs allege that the Regulations prevent adult homes

5

and their operators from giving advice to residents and thus violate the homes and operators' free speech rights. (Id. ¶¶ 211-216.)

The SAC also alleges, on behalf of all of the Residents Plaintiffs, that the Regulations are "arbitrary and capricious" (id. ¶¶ 252-57), and that they are an ultra vires usurpation of legislative power (id. ¶¶ 248-51).

### D. The Empire Plaintiffs' First Amended Petition

On November 26, 2013, the Empire Plaintiffs filed their FAP in state court. Defendants answered on April 8, 2014. The FAP alleges that the Regulations (1) violate the FHA, ADA, and the Takings Clauses of the federal and New York State constitutions (FAP ¶¶ 163-202); (2) are "arbitrary, capricious, unauthorized and irrational" (id. ¶¶ 152-54); (3) are an ultra vires "usurpation of the power of the New York State Legislature" (id. ¶¶ 145-51); and (4) violate the due process rights of adult homes and certain current and prospective adult home residents (id. ¶¶ 155-62).

The FAP alleges that the Regulations harm adult home residents who have SMI and prospective adult home residents who have SMI by precluding them from being able to choose to live in a transitional adult home—with current residents being denied the choice to continue to reside in a transitional home and with prospective residents being denied the choice to begin to reside in a transitional home. (Id. ¶¶ 135, 138, 144.)

The FAP also alleges that the Regulations harm adult home operators in various ways. According to the FAP, the Regulations (1) require adult home operators to "dramatically reduce the mental health census through involuntary transfers," thus harming the home operators' businesses (id. ¶¶ 112, 139); (2) expose adult home operators to monetary fines if the homes fail to "fast track" the implementation of plans to reduce the mental health census (id. ¶¶ 112-13);

6

(3) expose the adult homes to discrimination lawsuits from residents because of the Regulations, (id. ¶ 79); and (4) give rise to the adult homes being given the "injurious label of a transitional adult home" (id. ¶ 162).

## II. DISCUSSION

Before the court are Defendants' motion to dismiss the Residents Plaintiffs' SAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Mot.; Mem.), and Defendants' supplemental motion for dismissal of the Empire Plaintiffs' FAP pursuant to Federal Rule of Civil Procedure 12(b)(1) (Suppl. Br.).

Defendants move to dismiss all claims of the SAC pursuant to Rule 12(b)(1), and nine of eleven claims pursuant to Rule 12(b)(6). (Mem.) For the reasons set forth below, the court grants Defendants' motion to dismiss the SAC for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). The court therefore need not reach the arguments in the Motion for why the SAC should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Indeed, a court facing challenges as to both its jurisdiction over a party and the sufficiency of any claims raised must first address the jurisdictional question. See Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963).

Defendants also move to dismiss all claims of the FAP pursuant to Rule 12(b)(1). (Suppl. Br.) For the reasons set forth below, the court grants the Supplemental Motion.

### A. Legal Standard

Pre-answer motions to dismiss for lack of standing are governed by Federal Rule of Civil Procedure 12(b)(1). Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56 (2d Cir. 2016). Where, as here, the "12(b)(1) motion is facial, i.e., based solely on the allegations of the complaint," the court's task is to determine whether or not the pleading "allege[s] facts that affirmatively and

plausibly suggest that [a plaintiff] has standing to sue." Id. If the well-pleaded allegations do not give rise to the inference that a plaintiff has standing, then dismissal is appropriate. See id. In carrying out this task, however, the court must accept all of the factual allegations in the complaint as true and draw "all reasonable inferences in favor of the plaintiff." Id. (citations omitted).

In order to have standing, a plaintiff "must have suffered an 'injury in fact'" that is "fairly . . . trace[able] to the challenged action of the defendant" and likely to be "redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (citations omitted). The plaintiff's "injury in fact" must be "(a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Id. at 560 (citations, internal quotation marks, and quotations omitted). An "injury in fact" is not imminent if it will take place "at some indefinite future time; it must be certainly impending." Id. at 564 n.2 (citation and internal quotation marks omitted). A plaintiff's pleading must plausibly and "clearly . . . allege facts demonstrating each element [of standing]." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (citations and quotation marks omitted); see also Aschroft v. Iqbal, 556 U.S. 662, 678 (2009).

B. Application

1. The Residents Plaintiffs

The Residents Plaintiffs in this case include (a) two individual plaintiffs, Walter Roberts and Kenneth Przyjemski; (b) Residents and Families United to Save Our Adult Homes (the "Residents Association"); and (c) the "Operators," a category including certain adult homes and certain corporate entities that operate adult homes (SAC ¶ 33) and the New York State Health Facilities Association / New York State Center for Assisted Living ("NYSHFA"), an association

that purports to represent the interests of these businesses (SAC ¶ 12). For the reasons set forth below, none of these plaintiffs has standing to sue.

### a. The Individual Plaintiffs Lack Standing

As a preliminary matter, the court notes that it has been advised by Plaintiffs' counsel that one of the individual plaintiffs, Walter Roberts, has passed away. (Pl. Feb. 14, 2018, Letter (Dkt. 94).) However, Plaintiffs' counsel has provided no documentary proof of Roberts's death. In light of Plaintiffs' counsel's assertion, it appears that Roberts's claims are moot and that he thus lacks standing. In the following discussion regarding Przyjemski, however, the court includes references to Roberts—as if he had not passed away—both because of the lack of documentation and because the analyses regarding Przyjemski and Roberts would have been the same if not for Roberts's death.

Of the Residents Plaintiffs' eleven claims, nine allege that the Defendants have infringed the rights of individuals with mental illness. See Section I.C., supra. There are two general types of injury that the pleading alleges that these affected individuals have incurred. First, the Residents Plaintiffs allege that mentally disabled individuals have been or will be denied the right to live where they choose to live. (See SAC ¶¶ 5, 133, 219, 223, 227, 230, 233.) Second, the Residents Plaintiffs allege that the Regulations have caused mentally disabled individuals to suffer coercion or harassment. (Id.; see also id. ¶¶ 241-42.) As explained below, however, the two individual plaintiffs in this case do not claim that they have suffered, or are in "actual or imminent" harm of suffering, either of these two types of injuries personally.

Both Roberts and Przyjemski state clearly that they live in the adult homes that they chose and in which they want to continue to reside. (SAC ¶¶ 13-14.) They do not allege that they are at any imminent, or even likely, risk of involuntary displacement. See, e.g., Hakim v.

9

Chertoff, 447 F. Supp. 2d 325, 328 (S.D.N.Y. 2006) (holding that an injury was "too remote temporally to satisfy Article III standing" if the injury could only occur four years after suit was filed) (citation omitted). The Residents Plaintiffs' original complaint, filed in 2013, included similar statements that Roberts and Przyjemski lived in adult homes and wished to remain there (Compl. (Dkt. 1-5) ¶¶ 16, 17), and they have evidently continued to live in these homes during the interim years notwithstanding the Regulations. Further, not only do the Residents Plaintiffs not include facts giving rise to the inference that Roberts and Przyjemski are likely to be involuntarily displaced in the near future, but the Regulations explicitly do not interfere with an adult home resident making a choice as to whether to stay in the adult home or whether to move out. See N.Y. Reg., Jan. 16, 2013 at 15. The Residents Plaintiffs therefore cannot demonstrate the existence of an injury in fact.

The Residents Plaintiffs argue in their response brief that Roberts and Przyjemski's fear or anxiety of future removal is sufficient to satisfy the injury-in-fact requirement. (Pls Opp'n at 6.) In making this argument, the Residents Plaintiffs rely in part on Second Circuit opinions from 2008 and 2006: Ross v. Bank of America, N.A., 524 F.3d 217 (2d Cir. 2008), and Denney v. Deutsche Bank AG, 443 F.3d 253 (2d Cir. 2006). The law has evolved since these opinions were written, however. "Since Ross, the Second Circuit has clarified that allegations of fear or anxiety of future harm are alone insufficient to confer standing. Instead, 'such fears may support standing when the threat creating the fear is sufficiently imminent.'" Feinberg v. Apple, Inc., No. 15-CV-5198, 2016 WL 4371746, at *3 (S.D.N.Y. Aug. 10, 2016) (quoting Hedges v. Obama, 724 F.3d 170, 195 (2d Cir. 2013)). As discussed above, however, the risk that the Residents Plaintiffs allege is causing Roberts and Przyjemski fear or anxiety is one that is not imminent. The risk that these individuals might not be re-admitted to their transitional homes if

10

they choose to leave and later attempt to return to the homes is not one that is imminent. Both Roberts and Przyjemski are living where they choose to live, and the conjectural harm that the Residents Plaintiffs invoke is neither concrete nor imminent. Thus, these plaintiffs' claimed fear or anxiety does not establish an injury in fact.

As for whether the Regulations have caused Roberts or Przyjemski to suffer coercion or harassment, the SAC does not contain any allegations that either one of them has suffered coercion or harassment, whether as a result of the Regulations or otherwise. Further, in opposing the Motion, the Residents Plaintiffs offer no facts or arguments that would suggest such an injury.

Thus, because Plaintiffs Roberts and Przyjemski do not allege any actual injury, they lack standing. Their claims are therefore dismissed without prejudice. See Carter, 822 F.3d at 54-55 (dismissal for lack of standing must be without prejudice).

### b. The Residents Association Lacks Standing

The other member of the Residents Plaintiffs that is suing on behalf of individuals with mental illness is the Residents Association, an association of approximately 2,600 residents of adult homes and family members. (SAC ¶ 11.) This plaintiff lacks standing as well.

For an organization to have associational standing, it must satisfy the three requirements articulated by the Second Circuit in Bano v. Union Carbide Corp., 361 F.3d 696, 713 (2d Cir. 2004). An association has standing only if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id.

The Residents Association lacks standing because it is unable so satisfy the first prong of the Bano test: that the association's members would otherwise have standing to sue in their own right.[9] As with Roberts and Przyjemski, see Section II.B.1.a., supra, the Residents Plaintiffs do not allege that any specific member of the Residents Association suffered either of the two types of injury that have allegedly been suffered by mentally disabled individuals (i.e., involuntary displacement from an adult home or harassment or coercion). The Residents Plaintiffs state that members of the Residents Association either are current residents of adult homes who live there by choice, or family members of such residents (id. ¶¶ 11, 140), but do not claim that any of the residents have been required to leave. Similarly, the Residents Plaintiffs do not allege that any specific member of the association was harassed or coerced. See Summers v. Earth Island Inst., 555 U.S. 488, 498-99 (2009) (a plaintiff must name the members of an organization who were injured); see also Draper v. Healey, 827 F.3d 1, 3 (1st Cir. 2016) (holding that an association has no standing to sue where a complaint fails to identify any member of the group who allegedly was injured).

The Residents Plaintiffs maintain that, even if the Residents Association did not satisfy the Bano test, the Residents Association can establish standing by showing that it has standing to sue in its own right. (Pls Opp'n at 8-9.) Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg, 290 F.R.D. 409, 415-16 (S.D.N.Y. 2012). For the Residents Association to have direct standing to sue in its own right, it would have to independently satisfy standing requirements: injury in fact, causation, and redressability. Id. The Residents Plaintiffs, however, fail to allege that the Residents Association suffered an independent injury in fact. Further, in opposing the Motion,

---

[9] Because the court concludes that the Residents Association fails the first prong of the Bano test (and in light of the fact that the Residents Plaintiffs must satisfy all three prongs of the Bano test for the Residents Association to have associational standing), the court does not address the parties' dispute about whether the third prong of the Bano test is satisfied.

12

the Residents Plaintiffs offer no facts or arguments that would suggest such an injury. Thus, the Residents Association does not have independent standing either.

For the foregoing reasons, the court concludes that the Residents Association lacks standing, and so dismisses its claims without prejudice.

### c. The Operators and NYSHFA Lack Standing

The last group of Residents Plaintiffs includes (1) "Operators," a category including certain adult homes and certain corporate entities that operate adult homes (SAC ¶ 33), and (2) NYSHFA (SAC ¶ 12). According to the Residents Plaintiffs, the Operators and NYSHFA have incurred three types of alleged injuries: The Residents Plaintiffs allege that Defendants, through the Regulations, have (1) limited Operators' adult home operating certificates; (2) required Operators to reduce their number of residents; and (3) denied Operators the purported right to give advice and assistance to residents to protect their health, welfare, and safety. (See SAC ¶¶ 205-16, 246.) For the reasons discussed below, however, these allegations do not give rise to standing.

The Operators first contend that their operating certificates have been limited. (SAC ¶¶ 243-47.) However, the Residents Plaintiffs fail to allege any facts that plausibly support this argument. See Iqbal, 556 U.S. at 678. Further, there is reason to think that the Residents Plaintiffs would not be able to allege such facts: The Regulations do not include any mention of operating certificates, and the Residents Plaintiffs do not suggest any contrary reading. The Residents Plaintiffs also do not contend that any specific certificates were altered by Defendants, and they do not articulate how any Operator's certificate is limited by the Regulations, or is in any way changed by the enactment of the Regulations.

The Operators next contend that Defendants required the Operators to reduce their number of residents. As with the Operators' first contention, they do not allege any facts that could raise an inference that they suffered such a harm. Moreover, there again is reason to think that the Residents Plaintiffs would not be able to allege such facts, and that Operators are not required by the Regulations to reduce the total resident population. Even under the Regulations, the Operators and other adult homes are authorized to operate with the same fixed number of beds. The Residents Plaintiffs do not contend that any homes—much less, any specific home—had beds decertified or that Operators were compelled, in any other way, to reduce their number of beds after the Regulations were enacted.

Lastly, the Operators contend that the Regulations injure them by preventing them from "giving advice and assistance to Residents . . . to protect their health, safety, and welfare." (SAC ¶ 212). As with the Operators' first and second contentions, the court finds no support for this harm in the SAC. The Residents Plaintiffs do not identify any Operator that, as a result of the Regulations, has been unable to give advice to any resident. These general allegations are not sufficient to confer standing upon the Operators. See Iqbal, 556 U.S. at 678. And, as with the prior alleged harms, the Operators' claim here misunderstands and misconstrues the Regulations, which do not prevent the Operators from giving advice and assistance to residents. Instead, what the Regulations do, in respects at all relevant to the Operators' third contention, is (1) require that the Operators create room for housing contractors to meet with the residents, and (2) prevent the Operators from interfering with these meetings. NYCRR, tit. 18, § 487.13(h).

The Residents Plaintiffs argue that the Operators have standing because (1) when a law is aimed directly at a person, standing is conferred, and (2) the Regulations are aimed directly at the Operators. (Pls. Opp'n at 10-11.) In support of their first contention, the Residents Plaintiffs cite

14

Virginia v. American Booksellers Association, Inc., 484 U.S. 383, 392 (1988). This case, however, does not support the proposition that the fact that a regulation is "directly aimed" at a plaintiff is sufficient to establish standing. Rather, American Booksellers states that "[the injury-in-fact] requirement is met here, as the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." Id. Thus, standing requires more than the mere fact that a law is "aimed" at a particular party: A party must still point to some objective harm. The Residents Plaintiffs argue that they do face something more: They may face penalties for violating the Regulations, and the alternative to facing these penalties is to "discriminate against individuals." (Pls Opp'n at 10-11.) The Residents Plaintiffs' argument is not persuasive. Even if incurring these penalties did constitute imminent financial harm—and the Residents Plaintiffs do not claim that such harm is imminent—the Residents Plaintiffs do not establish an injury in fact, because the option remains open to them to comply with the Regulations and thus avoid penalties. By arguing that complying with the Regulations would involve discriminating against individuals, the Residents Plaintiffs have not provided an argument for how the Residents Plaintiffs themselves would be harmed, and thus they fail to establish injury in fact.

In determining whether NYSHFA has standing, the court applies the Bano test for associational standing, discussed in Section II.B.2., supra. As with the Residents Association, NYSHFA fails the first prong of the Bano test, as it cannot show that any of its members would have standing to sue in their own right. Bano, 361 F.3d at 713. Since, as discussed above, the Operators themselves (i.e., the members of NYSHFA) do not have standing in their own right, NYSHFA therefore lacks associational standing. Further, as with the Residents Association,

NYSHFA fails to establish independent standing, and, in opposing the Motion, the Residents Plaintiffs offer no facts or arguments that would support the existence of independent standing.

\* \* \* \*

Accordingly, the court concludes that neither the Operators nor NYSHFA has standing, and so dismisses their claims without prejudice.

### d. Summary

For the foregoing reasons, all Residents Plaintiffs lack standing. Their claims are thus dismissed without prejudice.

## 2. The Empire Plaintiffs

The Empire Plaintiffs in this case include (a) eight individual plaintiffs: Lucia Bennett, Susan Osterhoudt-Burnett, Joseph Simone, William Stanton, John Tory, Lawrence Wong, Jeffrey Frost, and Mario Vogelmann (FAP ¶¶ 14-23); (b) five adult homes: Dutchess Care; Elm York, LLC; Harbor Terrace Adult Home and Assisted Living; Central Assisted Living, LLC; and Adirondack Manor Home for Adults (collectively, the "Empire Adult Homes") (id. ¶¶ 8-12); and (c) the Empire Association, a "trade association" allegedly representing the interests of 265 adult care facilities (id. ¶ 7). For the reasons set forth below, the plaintiffs in all of these categories lack standing to sue.

### a. The Individual Plaintiffs Lack Standing

For the purpose of analyzing whether the eight individual plaintiffs have standing, the court separately addresses three separate sub-groups of the eight individual plaintiffs.

#### i. Plaintiffs Bennett, Osterhoudt-Burnett, Simone, Stanton, Tory, and Wong Lack Standing

Plaintiffs Bennett, Osterhoudt-Burnett, Simone, Stanton, Tory, and Wong are individual plaintiffs who were all living in transitional adult homes at the time that the FAP was filed.

(FAP ¶¶ 14-19.) Accordingly, these six individual plaintiffs do not allege that they were excluded from a transitional adult home because of the Regulations. These plaintiffs thus lack standing to sue, and this is for substantially the same reasons given for why the individual Residents Plaintiffs lack standing. See Section II.B.1.a., supra.

### ii. Plaintiff Frost Lacks Standing

Plaintiff Frost does allege that he was excluded from a transitional adult home because of the Regulations. (FAP ¶¶ 21-22.) Notwithstanding this, Frost nevertheless lacks standing to sue.

Frost alleges that he applied to Dutchess Care in May 2013 and that he was denied admission, allegedly due to his SMI status. (Id. ¶ 22.) In the same month, however, Frost was admitted to another adult home in Dutchess County to which he applied—Hedgewood Home for Adults—and, in May 2013, Frost moved into the Hedgewood Home, where he was still living as of September 30, 2017. (Decl. of Carol A. Rodat, December 13, 2017 ("Rodat Decl.") (Dkt. 91) ¶ 4(a).)[10] Frost does not allege that he would prefer living in the Dutchess Care home to living in the Hedgewood home, and there is no evidence supporting an inference that he would. Thus, there is no basis for inferring that Frost was harmed by being excluded from a transitional adult home. Thus, Frost does not have standing to sue.

### iii. Plaintiff Vogelmann Lacks Standing

Like Frost, Plaintiff Vogelmann alleges that he was excluded from a transitional adult home because of the Regulations. Notwithstanding this, Vogelmann still lacks standing to sue.

Vogelmann lacks standing to sue because his claims are moot. See Cnty. Of Suffolk, N.Y. v. Sebelius, 605 F.3d 135, 140 (2d Cir. 2010) (stating that federal court jurisdiction is

---

[10] Contrary to the Empire Plaintiffs' contention, the court's view is that the declaration of Carol A. Rodat can properly be considered.

limited to disputes involving live cases or controversies and that, under the doctrine of mootness, "courts' subject matter jurisdiction ceases when an event occurs during the course of the proceedings or on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party." (internal quotation marks and citation omitted)). Even if Vogelmann previously had standing due to being denied admission to Dutchess Care, his claim is now moot, because Vogelmann was admitted to Dutchess Care after the FAP was filed. (Rodat Decl. ¶ 4(b).) Vogelmann was admitted to Dutchess Care in 2015, and, though he moved to a different adult care facility in August 2016, it has not been alleged that Vogelmann preferred to stay at Dutchess Care. (Id.) Thus, Vogelmann's claims are moot, because there is no allegation or evidence that Vogelmann is currently being denied the opportunity to live where he wants to live.

\* \* \* \*

For the foregoing reasons, all eight of the individual plaintiffs among the Empire Plaintiffs lack standing to sue.

### b. The Empire Adult Homes Lack Standing

The Empire Plaintiffs contend that, because of the Regulations, the Empire Adult Homes have been or will be (1) forced to discharge much of their resident population, resulting in closure of the homes; (2) fined for failing to implement compliance plans; (3) sued by adult home residents for discrimination; and (4) identified by the "injurious label" of "transitional adult home." (FAP ¶¶ 79, 109-10, 139-40, 162, 166.)

These allegations, however, do not give rise to standing. This is for substantially the same reasons given for why the allegations in the Residents Plaintiffs' SAC do not give rise to

standing for the individual Residents Plaintiffs, see Section II.B.1.a., supra, or for the adult homes Residents Plaintiffs, see Section II.B.1.c., supra.

### c. The Empire Association Lacks Standing

The Empire Plaintiffs also contend that the Empire Association has standing. The Empire Association lacks standing, however, and this is for substantially the same reasons given for why the Residents Association and NYSHFA (both of which are among the Residents Plaintiffs) lack standing. See Sections II.B.1.b-c., supra.

### d. Summary

For the foregoing reasons, all Empire Plaintiffs lack standing. Their claims are thus dismissed without prejudice.

\* \* \* \*

Accordingly, the court concludes that all Residents Plaintiffs lack standing and all Empire Plaintiffs lack standing, and so dismisses their claims without prejudice.

## C. Disposition

Concluding that all Residents Plaintiffs and all Empire Plaintiffs lack standing, the court dismisses their claims without prejudice. In addition, however, the court remands the Residents Plaintiffs' and Empire Plaintiffs' claims to state court. See, e.g., 28 U.S.C. § 1447(c) (stating that if, after a case has been removed, the district court determines that it lacks subject matter jurisdiction, the court must remand the matter to state court for further proceedings); Lajaunie v. Samuels & Son Seafood Co., 614 F. App'x 33 (2d Cir. 2015) (same). Thus, remand to state court following dismissal is appropriate in this case.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion for dismissal of the Residents Plaintiffs' second amended complaint (Dkt. 57) and Defendants' supplemental motion for dismissal of the Empire Plaintiffs' first amended petition (Dkt. 90) are GRANTED. The Residents Plaintiffs' second amended complaint (Dkt. 1-2) and the Empire Plaintiffs' first amended petition (Dkt. 19-8) are DISMISSED WITHOUT PREJUDICE. The court REMANDS the Residents Plaintiffs' and the Empire Plaintiffs' claims to state court.

SO ORDERED.

Dated: Brooklyn, New York
March 5, 2018

s/Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge